The Honorable, the Judges of the United States Court of Appeals for the 4th Circuit. Oyez, oyez, oyez. All persons having any manner or form of business before the Honorable of the United States Court of Appeals for the 4th Circuit are admonished to draw an eye and give their attention, for the Court is not sitting. God save the United States and this Honorable Court. Be seated. I want to welcome everybody to the 4th Circuit today. We have two interesting cases. The first one, First Professionals Insurance v. Sutton, Mr. Cofalos. Mr. Cofalos. Yes, sir. Good to have you, sir. Thank you. It's good to be back. The podium is yours. Thank you. May it please the Court. Dr. Sutton received a request for medical records in 2008. She reported the request to her carrier at the time. The carrier took no action and Dr. Sutton heard nothing further. Because of this, she had no reason to believe in 2009, the next year when she filled out her application to First Probe, that there might be a claim that would be related to the request for medical records that she had already reported. The First Probe is a different insurance company. Yes, sir. I'm George Cofalos and I represent Kirsten Sutton. Section 11C of the First Probe policy excludes from coverage any medical incidents that should have been disclosed on her application. Normally, this requires expert testimony. Specifically, when considering the veracity of an applicant's answers on an application for insurance, the courts have held that whether reasonable professional possession of the facts that the insured actually possessed at the time of the application would reasonably understand the application to require the disclosure of the incident requires expert testimony. There was no expert testimony in this case. Confronted with that, and ignoring the fact that Dr. Sutton had already reported this request for medical records, Judge Gergel stretched to find facts and circumstances in the letter itself, the request for the medical records, that would... That's correct. Not to require expert testimony. This needed expert testimony. Judge Gergel was acting as a trial... He was a trial to the bench. Yes, sir. He was. He was entitled to make findings of fact. That's correct. But the requirement for expert testimony is a matter of law. What kind of expert would you have? A medical expert? Yes. What would a doctor know about filling out an insurance form? Well, a doctor would be able to look at the circumstances that were attendant to the claim, the birth, and say, well, given this and given the request for medical records, it might be reasonable to expect that there would be an incident, there would be a medical incident. There was no such testimony. Or a doctor could say, when you receive a request for medical records from an attorney, you think that there might be an incident. But lay people do that all the time. They fill out forms just to answer the questions. That's correct. And sometimes a medical expert would not be necessary. For example, in a case where a lawyer knows, for example, that his client has said, I'm going to sue you, or the client has expressed dissatisfaction and the lawyer knows that, or the lawyer knows that he made a mistake and expects that there might be something happening, you don't need a medical expert once you can offer that sort of lay testimony. But there was none of that in this case. So this would have required medical proof. Now, Judge Gergel identified three, what he called three facts and circumstances attendant to the request for medical records that he said would have given or might have given rise to the belief that there could be a claim in 2009, even though she had already reported this. The three things he says that he relies on are, first, he says the request for medical records comes from an attorney. But he concedes, and it was undisputed and unrebutted in the trial, that a request for medical records from an attorney standing alone is not sufficient to give rise to the belief that there might be a potential claim. Second, Judge Gergel says, well, the report of the request, because it wasn't the lawyer's letter, Dr. Sutton got a letter from the hospital saying that they'd gotten a request, that letter said that the lawyer had asked for the complete medical record. And Judge Gergel points out that that's more costly than a simple limited medical record. And he says that that's often associated with the malpractice. Well, of course, there's no evidence in the record to say that. That's pure speculation. But the fact of the matter is that Judge Gergel miscarried it. Judge Gergel probably practiced law in this area for some time, had he not? He sure has. That doesn't mean that he didn't. He didn't come over on the pickle boat, I don't think. No, and he handled medical malpractice cases. That doesn't obviate the need for a medical expert. I understand that. I'm not saying it does, but he's an able and experienced judge. He is. He's a very good judge. We had a good time trying the case in front of him. What do you do with the fact, or does it matter, that she was offered by the risk assess, risk manager, the opportunity to come and look at the records, and she didn't do that? Well, that would be important if there was a medical expert who came in and said, if she had looked at these things, this is what the significance of those records would be. The fact that she was offered the opportunity to look at the records without anything else is of no consequence. Because the only reason those records would be then significant, what's the implication of the records? You would need a doctor, a medical expert, to explain, had she looked at these records, she would have learned such and such. There was no expert that was presented. With regard to this issue of Judge Bergel saying that the request was for the complete medical record, it's not quite true because the request was for the medical records, the complete medical records, for one day. For one day related to the mother and not to the child who ultimately made the request. The day the baby was born. And none of these three circumstances that Judge Bergel identified changed the fact that Dr. Sutton had reported this. Nothing had happened, and she had no reason to believe that something later would happen or that she needed to report it again. How can it be said that Dr. Sutton should have understood that the 2008 letter might require her to disclose in 2009 that a claim might happen if nothing was done about her reporting the 2008 letter? Judge Bergel's error was compounded by his failure to properly construe the exclusion. Exclusions in insurance policies are narrowly construed. In this case, the Section 11C of the policy excludes from coverage any claim for damages arising from a medical incident that should have been disclosed. The term medical incident is a term of art and it is defined in the policy as an act, error, or omission. So what the policy does is the policy excludes any negligence that should have been disclosed. Well, there was no testimony. Judge Bergel ignored that qualification of medical incident. And there was no testimony that Dr. Sutton should have been aware that there was negligence in the claim. Judge Bergel struggled to get around this requirement of the knowledge of the medical incident by saying that it's unnecessary. He said that there is no requirement that the applicant be aware of any specific act or omission that would give rise to a potential claim. Well, the whole idea of reporting a potential claim, a medical incident, presupposes knowledge of the medical incident. How can an insured be required to report a medical incident, an act, error, or omission, if the insured has no knowledge of an act, error, or omission? Now, it is true that there is an objective component to this. In other words, did she know or should have known? But that pulls us back into an expert. The last part of the policy has a requirement of an adverse outcome. In the application, the issue of whether a medical malpractice case is a medical malpractice case is a medical malpractice case. If the medical malpractice case claim was foreseeable, it turned on the existence of a request for medical records related to an adverse outcome. Related to the adverse outcome language is important. Every witness testified that the request for medical records standing alone does not give a doctor reason to believe that there might be a claim. And that's why the application qualifies the request by saying it should be a request related to an adverse outcome. Judge Gergel's error was that he ignored this important qualification and he stood the analysis on his head and he concluded that since it was foreseeable, he concluded it was foreseeable that there would be a claim. Therefore, the request for medical records had to be related to an adverse outcome. When it should be the reverse, did the request for medical records relate to an adverse outcome and did this give reason to foresee a potential claim? Judge Gergel said if it was reasonably foreseeable that a claim or suit might be filed, it's foreseeable that the patient did not have a good outcome. It's not what the exclusion said and Judge Gergel's error was in not narrowly interpreting that exclusion. That's all I have for today. Thank you very much. If there are any questions, I'll be happy to address them. We'll save them for rebuttal if we have to. Thank you. Mr. Cellini, did I pronounce that right? Yes, sir, you did. Thank you. May it please the court, my name is Tom Cellini. I represent the Appellee First Professionals Insurance Company known throughout the briefing as First Pro and I may use that term here. First, I think that it's important to understand and this court is already familiar having heard and seen these materials once that I don't want to go through the facts again. But to point out that on remand, this court instructed two questions to be answered to determine whether exclusion 11C was triggered. The first being whether it was reasonably foreseeable that the St. Francis medical records letter, request letter might reasonably lead to a claim or suit against Dr. Sutton. And secondly, whether that claim arising from the birth of Nathan Moore was also reasonably foreseeable, thereby triggering exclusion 11C. Judge Gerbel answered both of those questions primitively and gave in his opinion the reasons for doing so. Those are all fact-based or inference from fact-based testimony and evidence that is documented in the record. I think that Mr. Koufalos gives too little credit to what the letter says and the significance of the letter. This was not a routine request from a lawyer saying I'd like to have the records for this patient. What we have here is a letter from a risk analyst at a hospital where Dr. Sutton is practicing, which by its turn, and that letter is at the record page 670, is related to the patient Amy Moore. It has the medical record number. It has the requested information as being the complete medical record for June the 22nd, 2004 visit. A discreet date, a discreet visit, a discreet procedure. But he also says, Mr. Koufalos said it was for the mother, not the child. That's correct. And the policy says that with regard to labor and delivery, that the mother and child or the mother and fetus in terms of labor and delivery is considered to be one event. Secondly, all of the medical records regarding labor and delivery are under the mother's name because the fetus has not yet been born and not yet been passed off to the pediatrician to establish its own records. So the labor and delivery records, even including the child, are all encompassed under the mother's name for this visit. So you're saying that was the proper way to do it? That was the proper way to make that kind of a request, was to do it under the mother's name? Yes. All of the records related, what they were looking for, we know now, is they were looking for fetal monitoring strips and the suggestion that the child should have been taken earlier by cesarean because there were evidence within those monitoring strips suggesting the child was having distress. And in fact, the child was born, and you're honest to know the litany, with the cord wrapped around the left ankle and that there were concerning events that were showing up on that monitoring strip for about 45 minutes prior to birth. The child had AFCAR scores of 1 at 1 minute, 2 at 5 minutes, 2 at 10 minutes, didn't take its first gasp of breath until 18 and a half minutes after birth, wasn't breathing even on respiration effectively until 23 minutes after birth, and suffered hypoxic ischemic encephalopathy. So what this letter says is that we, as part of our ongoing risk management activities to identify potential claims within our health care system, conduct routine reviews of attorneys and patient requests for medical records received at Roper and St. Francis Hospital. Now there's the word routine. They didn't say this was a routine request. They say they routinely examine these requests, compare them with the records to try and identify ones which might be or become potential claims. And that's what they're communicating to Dr. Sutton. Here's one. We found it. They don't say that, but they imply it. And the reason they don't say it is you don't send those kinds of letters to your doctors. It goes on to say, this is a courtesy notification that an attorney representing the above-referenced patient has requested a complete copy of the medical records referenced above. The patient's complete medical record and request is available for your review in the medical records department. And should you wish to review these records, please contact the medical records, and it gives a telephone number. And if you have any questions regarding this request, please call me at the number listed above. That's the risk analyst. So what we're talking about is the hospital, as part of its routine review of these requests, has identified this and has sent it to Dr. Sutton and said, review the records. Are they available for your review? If you have a question, give me a call. I'll discuss this on the phone with you. So this is not the kind of routine request that Mr. Cofalo suggested that it was. But with regard to what the judge found. Did she ever go and review the records? No, she didn't. Did she attribute anything to that? Pardon me? Which way is that cut? Does that help you or does that help Mr. Cofalo? Well, if she had gone to review the records, then she wouldn't have any basis to subjectively state, I thought this was a routine record request. She did testify, however. But in all of her years of practice, in all of her years of being on staff in this hospital system, and after delivering 2,000 infants and having been sued multiple times for similar circumstances, the Arrington case I think is discussed in here. She testified that this letter was unique, that she had never before and has not since received a letter like this. And that this letter so concerned her or was so concerning that when she received it, she sat down and she called her malpractice insurer, MedPro, the prior insurer, the insurer at that time, and disclosed to them this letter and what it said. That doesn't sound like she took it to be a routine request, that her call to MedPro was in fact appropriate. And this court has already said in the last opinion that MedPro, that reporting to MedPro was sufficient to put MedPro on notice of the existence of a potential claim by Nathan Moore. All we're asking in this case and what Judge Gergel ruled was that that same information should have been disclosed on the application form that was signed by Dr. Sutton in 2009, less than 10 months after she received this letter and reported it to MedPro. Of course, I take it what you mean when you say, as you did just now, that the information should have been disclosed. What you really mean is she should have answered those two questions, yes rather than no. Correct. Then your client would have been able to conduct its appropriate investigation. Absolutely. Absolutely. What about the medical expert claim by the other side? Judge Gergel said, I don't need a medical expert to tell me what every fact finder is asked to do in terms of a reasonable person. He said, essentially, I read this letter, I read the facts that I know that are uncontested in this case, and I know, based on my own experience, that I don't need an expert to come in and tell me. Not that an expert testimony wouldn't have been relevant or admissible, but he says, I don't need this as a fact finder to make the conclusion. You're saying that's a discretionary call by the judge? I think so. We'd review for abuse of discretion. That would be the type of review we'd conduct on that kind of ruling? I think it would have to be at a minimum abuse of discretion standard. In addition to which... And what would we take into account if we were going to say his discretion was not abused? Could we take into account that he was a prior practitioner in this area? I think... Would he strive cases like this as a judge? What kind of information can the appeals court consider in the context of determining whether there was an abuse of discretion in saying, I don't need any expert? Well, I think what this court can take into account is the underlying evidence that was presented and the reasonableness of the inferences drawn from it. And if that's sufficient for him to make that conclusion that he did not abuse his discretion, and that would include credibility determinations as well if credibility determination is into it. But he went further, and he said that's not only that, but if I have to have expert testimony, then why in the world didn't Dr. Sutton provide that when she testified that this is the kind of letter which by her training and experience, she has always been taught needs to be reported as part of her obligation as an insurer to her insurer. What she did is she reported that obligation or fulfilled that obligation to one insurer, MedPro, but didn't do it on the application. I'd like to suggest to you that standard of review is probably de novo because this is a sufficiency of the evidence question, isn't it? In any case, it seems to me, in which a claim is made that expert testimony is necessary to prove a fact of consequence to the issue, it's a sufficiency of the evidence question. So in a medical malpractice case, if you don't have a qualified professional to come in and say what the defendant did was fell below the standard of care, that's a sufficiency of the evidence issue, right? I mean, don't you agree with that line of reasoning? In a bench trial, the sufficiency of the evidence, you know, I don't know. But that's the question that Judge King was very astutely getting at. Is the question of sufficiency of the evidence any different in a bench trial or a jury trial? And I'm suggesting to you that the answer is no. Well, I agree with that. I thought you might. Now, I would also disagree with Mr. Cofalas' argument that medical testimony is required under South Carolina law. I understand your argument, of course. And that's a sufficiency of the evidence argument. Right. Right? I think it's just a question of evidence and whether the prior fact had sufficient evidence to make that conclusion. Whether judge or jury? I think that's correct. Now, I think when there's a judge making it in a bench trial, there might be a different presumption that attaches to the findings. But I agree with your honor on that score. And I disagree with Mr. Cofalas that South Carolina law requires medical testimony. What South Carolina law requires in a medical malpractice case is expert testimony to establish, A, the standard of medical care, and, B, that that medical care standard was breached. But then South Carolina goes on to say that there's some kinds of cases that are in the medical context where even you don't need to have expert testimony. You leave the clamp in the belly. I don't think you need a doctor to come in and say it. or a sexual assault while a patient's under anesthetic, or lack of informed consent to a procedure that wasn't disclosed to the patient prior to the surgery. So I disagree with those concepts. If I may, let me go further now to, I think, the other points that were made. And that was the construction of the exclusion and whether it requires a medical incident. What the exclusion is, is it excludes the damages arising from a medical incident. You mean coverage? Right. And it really incorporates the application, which was issued in advance of the policy anyway. And if you go to questions five and seven, as this court recognized in the last appeal and on its remand, that what appears in those questions is, in fact, a definition of what appears a definition in the policy of a potential claim. And a potential claim can be established by a number of things. It doesn't mean that the doctor has to know that somebody's specifically suing them for this mistake or that mistake, or failure to monitor fetal strips. What it means is that you're reasonably on notice by an event, and specifically listed as an event, is an attorney request for record with an adverse outcome, is a medical record request. And this is more than simply a medical record request. It is a third party who is advising that they've received one, that they've reviewed it as a standard matter, and in a very unique, never-before-seen way by Dr. Sutton, advising them, we've got these records segregated, and you can call me or you can come down and take a look at those records. But we've identified this, and they use the word, potential claim, which is a red flag. It should send flares up, and it did not. Finally, as to the adverse outcome, what the judge held was that once this is identified, or at least reasonably identified as a potential claim, then a normal inference from that is there's an adverse result. And recognize, if there isn't an adverse result, and there's no reason to fear a potential claim, and no reason to suggest that the lawyer, excuse me, the doctor, shouldn't make those disclosures to start with. There's no consequence to the doctor, absent the adverse implications of reporting or failing to report. I liken this to receipts of a letter from the state bar saying that they've received a complaint against you, and that if I want to see the record or the complaint, that I can come down and take a look at it. I would rack my brain to determine what the complaint was and remember what the party had to say. And you'll note that in, I think, footnote four of the decision, the judge raised a little bit of a question about whether or not Dr. Sutton really had forgotten this record, or had forgotten the receipt of this letter at the time she filled out her application. But she says, I don't have to decide that. I don't have to decide that because there's plenty of other evidence in the record. And he lists that, plenty of other evidence in the record to suggest that this was a potential claim and one that was worthy of her attention. What he said was that it shows that within that record itself, the patient had retained an attorney to investigate a matter in which medical records were relevant, raises the possibility that the attorney was evaluating a malpractice claim. They request a complete set of records for a specific hospital visit, therefore suggesting that the attorney was focusing on a very specific event, that is, a specific hospital visit. It's the type of focus for a complete medical records and discreet visit that's often associated with a medical malpractice claim. But the letter was authored by a risk analyst. It was part of an ongoing procedure within the risk department of the hospital to try and identify potential claims. It used the word potential claim and should have set off red flags and signals. Sutton testified the letter was unique within her experience. She had never before since received one like that. He said that this creates a reasonable inference that a potential claim or suit might be brought against Dr. Sutton. It did not matter whether she believed that such a suit would ultimately arrive. It just simply matters that a reasonable person certainly would have foreseen that. In addition, he goes on to point out that Sutton was in OBGN, high-volume obstetrical practice, that she'd had a couple of thousands of deliveries, that the practices are considerable at risk for medical malpractice suits, and that there was a high probability that the single-day admission or event with a labor and delivery would result in a potential claim. Thank you. Thank you, Mr. Zellig. Mr. Cavallo. Thank you, sir. Thank you. A couple of comments. With regard to the letter requesting medical requests referring to the mother for that one date, Mr. Salani said that the policy defines or includes the child as well as the mother as an incident. Mr. Salani concedes in his briefs that Dr. Sutton did not have the policy and was not aware when she filled out the application that mother and child were considered as one for purposes of an incident. So this letter, which related to the mother for one day, would give her no reason to believe that there might be a claim for the child. And as far as thinking that the letter was unique, it was unique. Dr. Sutton testified that the letter was unique, and it was that reason, not because she thought there might be a potential claim. Her testimony was it was an unusual letter. She didn't know why she received it, and that's why she reported it to her prior carrier. Having reported it to her prior carrier and having received no follow-up, no feedback, nothing afterwards, how can it reasonably be said that she should have foreseen that there might be a claim later on after she's already reported this letter? You know, the letter is interesting because in the first, in the trial, Judge Girdle denied first pro-summary judgment on that by saying that the record evidence suggests that a reasonable physician would not review the request for records by an attorney as a definite sign of an impending claim. Would not review, and of course that was the undisputed testimony, that a records request by an attorney does not mean that there's going to be a potential claim. A couple of points about the baby's condition. Mr. Salini's reference to the APGAR scores, the baby's breathing, hypoxia. All that would be important if they had presented medical evidence to explain the significance of those findings. They did not. So in the absence of medical evidence, what the medical record showed or would have showed is irrelevant because we don't know what the significance is. Even Judge Girdle himself had handled malpractice cases in the past. He must have evidence in the record to justify the findings that he makes. He can't pull out his personal experience. Specialized evidence. Dr. Sutton's testimony that she would, if she had remembered the letter, she would have told first pro of the letter is not the same as saying that she believed that there was a potential claim. She never believed that there was a potential claim because of the letter. When she reported it to first pro, she said, I didn't view this as a potential claim. I didn't understand what the letter was. So her saying that if I had remembered it, I would have told first pro, first professional, is not the same as saying that she recognized that there was a potential claim. Do you agree with the suggestion that the question of the role or not of an expert witness in this case is one of evidentiary sufficiency? No, I think that the question of whether there's an expert is a matter of law. Well, the question of evidentiary sufficiency is a question of law. That's exactly the point. Okay. I think that... Don't you agree with that? Well, I think so. But there's a threshold question, and the threshold question is, is medical expert testimony necessary in this case? But that just restates the question. The question on a trial record is whether there's sufficient evidence to support the findings of fact of the fact finder. That's correct. Okay. And in this case, there was not. In fact, Judge Floyd pointed out in his dissent in the first appeal, with permission, I'll read, the record is devoid of any evidence or factual findings supporting the conclusion that a reasonable physician in Dr. Sutton's shoes would have viewed the medical record's request as a first step to a medical malpractice claim. And that was the move to say? That's right. He was right. Very good dissent, I might say. There's one more point I wanted to make. Mr. Salini's comment about the State Bar is inappropriate, or inopposite, because in his suggestion that if the State Bar writes and says that they've received a complaint, of course you want to investigate. This letter was not notice of a complaint. This letter was a routine letter sent as a courtesy as part of their ongoing review of potential claims and was not notice of a complaint. It was simply a request for medical records. The fact of the matter is that when Dr. Sutton filled out this application, she had no reason to believe that there would be a claim. She had reported this old letter. Nothing had ever happened. That's all that I have, unless there are any other questions. Thank you very much, sir. Thank you, sir. We'll take this matter under advisement, come down and re-counsel, and go on to the next page. Thank you.
judges: Robert B. King, Henry F. Floyd, Andre M. Davis